```
            IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF NEW JERSEY
```

| | |
|---|---|
| SOUTH JERSEY HOSPITAL, INC., | HON. JEROME B. SIMANDLE |
| Plaintiff, | Civil No. 02-2619 (JBS) |
| v. | **OPINION** |
| CORRECTIONAL MEDICAL SERVICES, | |
| Defendant. | |

APPEARANCES:

Peter J. Deeb, Esq.
FREY, PETRAKIS, DEEB & BLUM, P.C.
10 Melrose Avenue
Suite 430
Cherry Hill, New Jersey 08003
     Attorney for Plaintiff

William J. Desantis, Esq.
KENNEY & KEARNEY, LLP
Woodland Falls Corporate Park
220 Lake Drive East
Suite 210
Cherry Hill, New Jersey 08034
     Attorney for Defendant

**SIMANDLE**, U.S. District Judge:

This matter arises from a contract dispute between South Jersey Hospital, Inc. ("South Jersey Hospital" or "Hospital") and Correctional Medical Services ("CMS"). Before the Court are cross-motions for summary judgment [Docket Items 20 and 21].[1] For the reasons explained below, the motion by CMS will be granted and the Court will dismiss Counts I, II and III.

---

[1] CMS filed it motion papers under seal.

**I.      BACKGROUND**

Plaintiff South Jersey Hospital is a regional medical center providing a broad range of healthcare services throughout Southern New Jersey.  Defendant CMS is a Missouri-based contract provider of healthcare services and staffing for prisoners in all New Jersey State Prisons.  Since 1996, CMS has contracted with the New Jersey Department of Corrections to provide healthcare at the prisons and, when necessary, at hospitals throughout the State.

In 1993, the Hospital entered into an agreement with MediChoice Network, Inc. ("MediChoice"), a privately held Preferred Provider Organization ("PPO"), to become a member of the MediChoice Preferred Provider Network.  As a member of that network, the Hospital was contractually obligated to offer medical services to subscribers of the MediChoice network at a discounted rate.  On April 19, 1996, CMS became a subscriber of the MediChoice Network by entering into a Provider Agreement with MediChoice relating to CMS's contractual obligation to the New Jersey Department of Corrections.  As a subscriber, CMS was offered discounted rates by participating health care providers.  The discounted rate offered to CMS by the Hospital was $975 per diem.  Under its contract with CMS, MediChoice would be paid "based on 18% of savings.  The percent of savings is calculated utilizing the billed charge and the repriced amount."  (See Def. Ex. M at 12.)

2

In early 2000, MediChoice was acquired by the Beech Street Corporation ("Beech Street"). As part of that same transaction, MediChoice's contracts were assigned to Beech Street. On July 1, 2000, the Hospital amended its pre-existing contract with MediChoice, increasing its prices for network subscribers from $975 per diem to a flat rate of 80% of full charges for both inpatient and outpatient services. When CMS learned that Beech Street and the Hospital had entered into this new agreement, it protested to both Beech Street and the Hospital. (Def. Ex. I Tr. 12:4-11.) CMS refused to pay that rate, instead reimbursing the Hospital at the expired $975 rate.

Shortly after becoming aware of this discrepancy, Andrew Guarni, Vice President of Finance for the Hospital, claims that he contacted CMS and sent notices indicating that the amount owed to South Jersey Hospital by CMS was greater than the amount being paid. (Pl. Summ. J. Br. at 5; Ex. H. 9-11.) In addition, Mr. Guarni claims to have contacted Richard Heyman of Beech Street and told him of the discrepancy in payment. Representatives of both parties met during this time on at least one occasion to discuss the payment disputes. (Id. Ex. I. 10-13.) On March 27, 2001, the Hospital made a written proposal to CMS, offering a rate of $1266 per diem for medical/surgical and $2055 per diem for ICU. (Def. Ex Q.) The offer was not accepted and CMS continued to pay the $975 per diem rate.

Beginning on September 1, 2001, CMS voluntarily increased the amount of its payments to the Hospital for services provided. (Def. Ex. K Tr. 80:6-12.)  Specifically, CMS began paying the rate which it utilized in situations where it did not have a direct contract with the provider, what CMS referred to as the "usual and customary rate" ("UCR").  The UCR at that time was $1253 for medical/surgical and $1567 for ICU.  The Hospital did not accept those terms of payment. (Pl. Opp. Br. at 8.)  On December 17, 2001, CMS made another written proposal to the Hospital, offering rates of $1121 per diem for medical/surgical and $1267 per diem for ICU.  (Def. Ex. S.)  The Hospital rejected that proposal as well.  Although the payment dispute was not resolved, CMS continued to bring all of its patients to the Hospital for treatment and the Hospital provided treatment without exception.  (Pl. Opp. Br. at ¶ 38.)

On June 1, 2003 the Hospital entered into an agreement with another PPO/HMO network, Qualcare.  Pursuant to that agreement, the Hospital would provide healthcare services to Qualcare subscribers at a specified discounted rate.  CMS began to access the Hospital through Qualcare in June 1, 2003 and, thus, has since been entitled to the discounted rate offered to Qualcare subscribers:  medical $1800 per diem; surgical $2365 per diem; and ICU $ 2076 per diem.  (Def. Ex. R.)

On March 28, 2002, the Hospital brought this action against CMS in state court seeking compensatory damages for claims of breach of contract as an intended third-party beneficiary of the contract between CMS and MediChoice (Count I); breach of an implied contract for services rendered "from July 1, 2000 through the present" (Count II); breach of an implied contract for services rendered from July 1, 2000 through December 31, 2000 (Count III)[2]; and recovery under quasi-contract for the value of services rendered from July 1, 2000 through January 1, 2002 (Count IV).  The action was properly removed to this Court on May 31, 2002.  Presently before the Court are cross-motions for summary judgment as to Counts I, II and III, filed on September 17, 2004, and this matter was reassigned to the undersigned on September 29, 2004.  Oral argument was convened December 22, 2004.

---

[2] The Hospital alleges in the Complaint that CMS terminated its agreement with the MediChoice network on January 1, 2001. (Compl. ¶ 16.)

**II.   SUMMARY JUDGMENT STANDARD OF REVIEW**

Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. Id.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.  Id.

In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party; in other words, "the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'"  Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (quoting Liberty Lobby, 477 U.S. at 255).  The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250; Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 329-30 (3d Cir. 1995) (citation omitted).

The moving party always bears the initial burden of showing that no genuine issue of material fact exists, regardless of which party ultimately would have the burden of persuasion at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Country Floors v. Partnership of Gepner and Ford, 930 F.2d 1056, 1061-63 (3d Cir. 1991) (reviewing district court's grant of summary judgment in a trademark action); Lucent Info. Manage. v. Lucent Tech., 986 F.Supp. 253, 257 (D.N.J. 1997) (granting summary judgment in favor of telecommunications provider in trademark action), aff'd, 186 F.3d 311 (3d Cir. 1999); Jalil v. Avdel Corp., 873 F.2d 701, 706 (3d Cir. 1989), cert. denied, 493 U.S. 1023 (1990).

However, the non-moving party "may not rest upon the mere allegations or denials of" its pleading in order to show the existence of a genuine issue.  Fed.R.Civ.P. 56(e).  Plaintiff must do more than rely only "upon bare assertions, conclusory allegations or suspicions."  Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985), cert. denied, 474 U.S. 1010 (1985) (citation omitted); see Liberty Lobby, 477 U.S. at 249-50.  Thus, if the plaintiff's evidence is a mere scintilla or is "not significantly probative," the court may grant summary judgment.  Liberty Lobby, 477 U.S. at 249-50; Country Floors, 930 F.2d at 1061-62.

The standard by which the court decides a summary judgment motion does not change when the parties file cross-motions. <u>Weissman v. United States Postal Serv.</u>, 19 F.Supp. 2d 254 (D.N.J. 1998).  When ruling on cross-motions for summary judgment, the court must consider the motions independently, <u>Williams v. Philadelphia House Auth.</u>, 834 F.Supp. 794, 797 (E.D.Pa. 1993), <u>aff'd</u>, 27 F.3d 560 (3d Cir. 1994), and view the evidence on each motion in the light most favorable to the party opposing the motion.  See <u>Matsushita Elec. Indus. Co., Ltd.  v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

**III. DISCUSSION**

The principal issue here is whether there was a contract in place between the Hospital and CMS during the period in dispute, July 1, 2000 through June 1, 2003. The Hospital contends that even though "a new agreement could not be reached" by the parties following July 1, 2003, an implied contract was created whereby CMS was obligated to pay "100% of the Hospital's regular rate on a going-forward basis." (Pl. Summ. J. Br. at 11-12.) CMS disagrees, arguing that the elements of an enforceable contract were never present. CMS therefore seeks summary judgment on all but the quasi-contract claims.

> [A] contract does not come into being unless there be a manifestation of mutual assent by the parties to the same terms; and, while the manifestation of mutual assent is usually had by an offer and an acceptance either in words or by conduct, it is elementary that there can be no operative acceptance by acts or conduct unless the offeree's assent to the offer according to its terms is thereby unequivocally shown. There must needs be an agreement – a "meeting of the minds" on the subject matter, to use a classic timehonored term, or there is no legally enforceable obligation. An expression of assent that modifies the substance of the tender, while it may be operative as a counter-offer, is yet not an acceptance and does not consummate a contract. In the very nature of a contract, acceptance must be absolute. If the contemplated agreement is to be bilateral, the "offeror and offeree, alike, must express agreement as to every term of the contract. The offeror does this in the offer; the offeree must do it in his acceptance." Such is the nature of the contract.

Johnson & Johnson v. Charmley Drug Co., 95 A.2d 391, 397 (N.J. 1953) (internal citations omitted). "An implied-in-fact contract

is a true contract arising from mutual agreement and intent to promise, but where the agreement and promise have not been verbally expressed.  The agreement is inferred from the conduct of the parties."  In re Penn Central, 831 F.2d 1221, 1228 (3d Cir. 1987) (citing Baltimore O. R.R. v. United States 261 U.S. 592, 597 (1923)); see Weichert Co. Realtors v. Ryan, 608 A.2d 280 (N.J. 1992) ("An offeree may manifest assent to the terms of an offer through words, creating an express contract, or by conduct, creating a contract implied-in-fact.")  However, "the rendering of a performance does not constitute an acceptance if within a reasonable time the offeree exercises reasonable diligence to notify the offeror of non-acceptance."  Restatement (Second) Contracts § 53(2) (1981).

    Here, the Hospital argues that between July 1, 2000 and June 1, 2003 the elements of a contract were present.  First, "[a]fter learning that the Hospital and Beech Street had entered into an Amended Agreement, CMS was fully cognizant that, by virtue of being a subscriber in the Beech Street network and a third party beneficiary under the Amended Agreement, it would be bound by the new rates."  (Pl. Summ. J. Br. at 11.)  The Hospital alleges that CMS assented to the new terms of this agreement as it continued to send its patients to the Hospital for care, all the while having knowledge that the Hospital demanded payment in the amount of 100% of its regular rate.

CMS, on the other hand, argues that it never assented to the Hospital's offer to pay either the 80% or 100% rate. To be sure, CMS did continue to bring its patients to the Hospital.[3] However, CMS argues that it did so solely out of necessity (South Jersey Hospital's facilities are the only hospitals in Cumberland County). In fact, "CMS specifically told [the Hospital] that it would not pay 80% of the billed charges; and . . . CMS then continued to pay $975.00 per diem and later an increased rate which was less than 80% of the amounts billed by [the Hospita]." (Def. Reply Br. at 4.; see Def. Ex. I Tr. 12:4-11.) The parties' failure to agree upon a price term prevents the Hospital from recovering at the higher rate under a theory of implied contract. See Temple University Hospital, Inc. v. Healthcare Management Alternatives, Inc., 764 A.2d 587, 595 n.12 (Pa. Super. Ct. 2000) ("Clearly, the parties' conduct did not create an implied contract under which HMA paid Hospital's published rates, as Hospital does not allege that HMA ever paid those rates.").

---

[3] Contrary to its suggestion, South Jersey Hospital was not required under 42 U.S.C. § 1395dd(a) to treat all patients brought to it by CMS. Rather, as the statute makes clear, South Jersey Hospital was arguably only required to treat patients with "emergency medical conditions." Id.; see 42 U.S.C. § 1395dd(e)(1) (defining "emergency medical condition"). In any event, the Hospital has offered no proof that the patients brought to it by CMS qualified for such care. Indeed, the CFO of the Hospital, John DiAngelo, assumed that the Hospital was treating a combination of emergency and non-emergency patients during the period in dispute. (Pls. Ex. I, Tr. 16:7-11.) With regard to emergency treatment for patients sent by CMS, the Hospital's argument for the recovery of the full rate becomes somewhat stronger, which can be assessed in light of a more complete record at trial of the remaining claim in quasi-contract.

In <u>Temple University Hospital</u>, the state implemented an experimental program whereby a managed care company contracted with the Pennsylvania Department of Public Welfare to provide in-patient hospital services to persons in the targeted region who were eligible to receive Medicaid.  The managed care company did not, though, provide medical services directly; rather, it entered into contracts with various health care providers to provide those services.  Pursuant to the managed care company's contract with the Department of Public Welfare, the managed health care provider entered into a contract with Temple to provide services to the program's participants.

During the contract period, Temple would hand-write the applicable amount due on the forms it used to bill the managed health care provider.  Upon the expiration of that contract, Temple advised the managed health care provider that it did not wish to extend the current contract, as it believed that the provider's payments were no longer adequate.  The provider did offer in writing to extend the terms of that contract until the parties reached an agreement as to the terms of a new contract.  No contract was reached, however, and for almost four years thereafter Temple continued to hand-post the adjusted rate at the bottom of the forms it submitted to the managed health care provider for payment.

Furthermore, during the period in dispute, the provider indicated to Temple that it would only reimburse it at a reduced rate. Temple rejected that offer in writing and informed the managed health care provider that it considered the expired agreement no longer valid. The provider responded by offering only to pay the expired rate. Temple once again rejected this offer and informed the provider that it thereafter would expect payment at full charges. The provider paid the amount identified by Temple for most of the subsequent claims, but only paid a reduced rate for others.

Based on those facts, the court in <u>Temple University Hospital</u> found that no implied contract existed after the expiration of the original agreement. The court reasoned that "the parties' conduct [did not] express[] Hospital's unconditional and absolute acceptance of [the provider's] offer for the simple reason that Hospital, in writing, expressly rejected [the provider's] offer twice," and made counter-offers. 764 A.2d at 593.

Similarly here, even extending all favorable inferences to the Hospital, the Court finds that no reasonable jury could conclude that CMS ever agreed to, or paid, the adjusted rates. For that reason, no implied contract existed between the parties as a matter of law and, at best, the Hospital is entitled only to recover the reasonable value of its service under a theory of

13

unjust enrichment or quasi-contract.  Accordingly, CMS is entitled to summary judgment upon Counts II and III.

Additionally, CMS is entitled to summary judgment on Count I as the Hospital was not, contrary to its claim, an intended third-party beneficiary of the agreement between the Hospital and MediChoice.  In determining whether a party is a third-party beneficiary to a contract under New Jersey law, "the real test is whether the contracting parties intended that a third party should receive a benefit which might be enforced in the courts; and the fact that such a benefit exists, or that the third party is named, is merely evidence of this intention."  <u>Broadway Maintenance Corp. v. Rutgers University</u>, 447 A.2d 906, 909 (N.J. 1982) (quoting <u>Brooklawn v. Brooklawn Housing Corp.</u>, 11 A.2d 83 (N.J. 1940).  Here, under the contract between MediChoice and the Hospital, "No patient, nor the client, nor any non-party shall have any third party beneficiary right hereunder." (Def. Ex. M ¶ 7.7.)  For these reasons, Count I will be dismissed as well.

**III. CONCLUSION**

    For the reasons expressed above, the Court will enter summary judgment in favor of CMS on Counts I, II and III.  The single count remaining in the Complaint, as contained in Count IV, is a claim under a theory of quasi-contract liability.  The accompanying Order is entered.


**June 15, 2005**                                    **s/ Jerome B. Simandle**
Date                                             JEROME B. SIMANDLE
                                                   U.S. District Judge